Defendant Tony R. Gross appeals a judgment of the Court of Common Pleas of Muskingum County, Ohio, convicting him on a seven-count indictment: Count one, Aggravated Murder in violation of R.C. 2903.01 (A), with a specification the victim was a police officer, a specification the aggravated murder was committed during the commission of an aggravated robbery, a specification the murder was committed to escape detection, and a firearm specification. Count two, Aggravated Murder in violation of R.C. 2903.01(B), has the same four specifications as count one. Counts three, four, five, and six were all Aggravated Robbery charges in violation of R.C. 2911.01, each with a specification of a prior aggravated felony conviction and a firearm specification. Count seven was having a weapon under disability in violation of R.C. 2923.13, with a specification of a prior conviction of a violent offense. The jury returned verdicts of guilty on all but the last count, and the court entered a conviction on the jury verdict as well as on count seven. The jury also returned a recommendation that appellant receive the death penalty on counts one and two. The court sentenced appellant to death on count two of the indictment, and to terms of imprisonment on count three, six, and seven. The remaining counts and specifications were merged. Appellant assigns eighteen errors to the trial court:
ASSIGNMENTS OF ERROR
ASSIGNMENT OF ERROR I
 THE INITIAL SEARCH OF TONY GROSS' HOUSE TRAILER VIOLATED HIS RIGHTS UNDER THE FOURTH AMENDMENT AND ARTICLE I, SECTION 14 OF THE OHIO CONSTITUTION ALL EVIDENCE OBTAINED FROM THAT SEARCH OR WARRANTS ISSUED BASED ON INFORMATION GENERATED FROM THAT SEARCH ARE FRUIT OF THE POISONOUS TREE AND SHOULD HAVE BEEN SUPPRESSED.
ASSIGNMENT OF ERROR II
 SAMPLES OF BLOOD, HAIR AND FINGERNAIL SCRAPINGS WERE TAKEN FROM TONY GROSS PURSUANT TO A WARRANT ISSUED ON THE BASIS OF INFORMATION OBTAINED IN AN ILLEGAL WARRANTLESS SEARCH OF HIS HOME IN VIOLATION OF HIS RIGHTS UNDER THE FOURTH AMENDMENT AND ARTICLE I, SECTION 14 OF THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR III
 THE PHOTOGRAPHIC IDENTIFICATION AND FOLLOW UP PROCEDURES USED WITH SEVERAL WITNESSES WERE SO SUGGESTIVE THAT THEY LED TO UNRELIABLE PRETRIAL AND IN-COURT IDENTIFICATION THAT SUBVERTED THE FAIRNESS OF THE FACT FINDING PROCESS AT BOTH THE TRIAL AND PENALTY PHASES.
ASSIGNMENT OF ERROR IV
 SHOW-UP IDENTIFICATION PROCEDURES USED WITH WITNESSES KAREN WRIGHT AND SHAWN JONES WERE UNNECESSARILY SUGGESTIVE AND CONDUCIVE TO IRREPARABLE MISTAKEN IDENTIFICATION NEITHER OF THEIR IN-COURT IDENTIFICATIONS OF TONY GROSS NOR TESTIMONY CONCERNING THE PRIOR IDENTIFICATIONS SHOULD HAVE BEEN ADMITTED AT TRIAL.
ASSIGNMENT OF ERROR V
 THE JURY SELECTION DEPRIVED TONY GROSS OF DUE PROCESS, A FAIR TRIAL AND A RELIABLE SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH EIGHTH AND FOURTEENTH AMENDMENTS, AND ARTICLE I, SECTIONS 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR VI
 INTRODUCTION OF "OTHER ACTS" EVIDENCE THAT TONY GROSS DEALT IN "CRACK" CAUSED UNDUE PREJUDICE, UNFAIRLY DENYING HIM DUE PROCESS, A FAIR TRIAL, AND A FAIR AND RELIABLE SENTENCING HEARING, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS, AS WELL AS ARTICLE I, SECTIONS 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR VII
 THE EVIDENTIARY ERRORS THAT PERVADED THE TRIAL DEPRIVED TONY GROSS OF DUE PROCESS, A FAIR TRIAL, AND A FAIR AND RELIABLE SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS, AND ARTICLE I, §§ 2, 9, 10
AND 16 OF THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR VIII
 ERRONEOUS INSTRUCTIONS, GIVEN TO THE JURY DURING THE TRIAL PHASE OF GROSS' CAPITAL CASE DENIED HIM DUE PROCESS AND A FAIR TRIAL.
ASSIGNMENT OF ERROR IX
 THE CONSIDERATION OF DUPLICATIVE AGGRAVATING CIRCUMSTANCES IMPROPERLY TIPPED THE WEIGHING PROCESS, DESTROYED THE RELIABILITY OF THE SENTENCING PROCESS AND RESULTED IN THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH SENTENCE IN VIOLATION OF THE FIFTH, SIXTH,
 EIGHTH AND FOURTEENTH AMENDMENTS, AS WELL AS ARTICLE I, SECTIONS 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR X
 THE TRIAL COURT'S INSTRUCTIONS TO THE JURY AT THE PENALTY PHASE DID NOT ADEQUATELY GUIDE THE JURY'S DISCRETION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AS WELL AS ARTICLE I, SECTIONS 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR XI
 TONY GROSS WAS CONVICTED AND SENTENCED TO DEATH IN A TRIAL CONDUCTED IN AN EMOTIONAL ATMOSPHERE BASED ON VICTIM IMPACT EVIDENCE AND ARGUMENT.
ASSIGNMENT OF ERROR XIII
 TONY GROSS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS AND ARTICLE I, SECTION 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR XIV
 JUROR MISCONDUCT DENIED TONY GROSS DUE PROCESS AND A FAIR TRIAL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS, AS WELL AS ARTICLE I, SECTION 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR XV
 THE CONVICTIONS AND SENTENCE OF DEATH IMPOSED UPON TONY GROSS VIOLATE THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AS WELL AS ARTICLE I, SECTIONS 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION BECAUSE OF THE CUMULATIVE EFFECT OF THE ERRORS THROUGHOUT BOTH PHASES OF THE TRIAL, THE PRETRIAL PREPARATION AND LITIGATION, THE MOTION FOR A NEW TRIAL AND THE APPELLATE PROCESS.
ASSIGNMENT OF ERROR XVI
THE DEATH SENTENCE IS INAPPROPRIATE IN THIS CASE.
ASSIGNMENT OF ERROR XVII
 WHEN PROPORTIONALITY REVIEW IS A NECESSARY COMPONENT IN THE APPELLATE REVIEW OF A CAPITAL CASE, DUE PROCESS AND EQUAL PROTECTION ARE DENIED WHEN THE STATE COURTS' REVIEW IS LIMITED.
ASSIGNMENT OF ERROR XVIII
 THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND §§ 2, 9, 10 AND 16 OF ARTICLE I OF THE OHIO CONSTITUTION ESTABLISH THE REQUIREMENTS FOR A VALID DEATH PENALTY SCHEME. OHIO'S STATUTORY PROVISIONS GOVERNING THE IMPOSITION OF THE DEATH PENALTY, DO NOT MEET THE PRESCRIBED CONSTITUTIONAL REQUIREMENTS AND ARE UNCONSTITUTIONAL, BOTH ON THEIR FACE AND AS APPLIED.
At trial, the State presented evidence that the following circumstances gave rise to this case. On July 12, 1994, four juveniles, Robert Hill, age sixteen, Max Ford, age fifteen, Courtney Ford, age fourteen, and Jason Stevens, age fifteen, were near the Certified station on the Maysville Pike in South Zanesville, Ohio. At approximately 3:00 a.m., the four juveniles saw a man at the Certified station urinating outside the building. They noticed he was driving a small yellow car. While the four juveniles were delivering papers on Courtney Ford's paper route, the same man drove past them in the small yellow car, within four to five feet of them. Courtney Ford made a note of the license plate number of the car.
After the juveniles finished delivering the papers, they returned to the Ford residence, near the Certified station. Returning, they again saw the same man and the same car. As they watched, the man broke the lock off the men's restroom door at the Certified station. Max Ford went into his residence and called the sheriff. Deputy Sheriff Michael Lutz responded to the call.
When the officer arrived, the juveniles approached the Certified station and stood in a used car lot next door to observe. The juveniles estimated they were some where between fifty feet to fifty yards away from the station. They saw the man emerge from the bathroom he had broken into, and begin to argue with Deputy Lutz. The man and officer scuffled and the officer struck the man on the head with his flashlight several times. The man struck Deputy Lutz, and took his duty gun from his holster. The officer began to back away as the man shot once. Deputy Lutz fell to the ground and the man approached him, shooting as he moved closer. The juveniles testified they then saw the man walk up to the officer, point the gun to his head, and shoot him twice at point blank range. The man got into his yellow car and drove away towards Zanesville, on Maysville Pike. The juveniles ran back to the Ford residence and called an ambulance.
The State also produced three witnesses who were driving separately on the Maysville Pike on their way to work, and saw the struggle between the officer and his assailant. One of the witnesses, Karen Wright testified after she saw the shooting, she turned her vehicle around and went back to the Certified station. As she attempted to turn her vehicle into the Certified station, Wright testified a yellow car came around from the back of the station, and nearly hit her car head-on as it turned north on Maysville Pike. Another of the eyewitnesses, Sherry Fugate, testified after she saw the incident, she continued down Maysville Pike. A small yellow car came up behind her and ran a red light. Fugate testified she observed the small yellow car turn onto Van Buren Street and then down the alley off of Van Buren. The third motorist, Shawn Jones, identified appellant as the man he saw fighting with an officer, just before Jones heard gun shots.
The State also called Ron Johnson to testify. Johnson testified the alley down which Sherry Fugate saw the small yellow car turn runs directly behind his home. Johnson testified appellant came to his home in the early morning hours of July 12, 1994. Appellant offered to trade Johnson a gun for crack-cocaine. Johnson gave fifty dollars worth of crack-cocaine to appellant in return for a .9 semi-automatic handgun. Johnson observed that Gross had a gash on his forehead and lent him a towel to wipe off the blood. The gun appellant traded to Johnson was Lieutenant Michael Lutz's duty weapon.
The State also presented the evidence of Patrolman James Landerman of the South Zanesville Police Department, who testified he also saw appellant's small yellow vehicle pulling from the Certified station onto the Maysville Pike. The State also presented evidence Lieutenant Lutz's last radio transmission to a dispatcher of the Sheriff's Department was a description of appellant's vehicle, and license plate number. The Chief of Police recognized the description of the vehicle, and went to appellant's home. At 5:00 a.m., he found appellant's small yellow car there and offered the opinion it had recently been driven because the hood was warm and there was no condensation on the car.
At 6:22 a.m. on July 12, 1994, officers found appellant hiding in the weeds outside his home, and arrested him. They observed he had a head injury and was wearing no shirt or shoes.
The officers returned appellant to the Certified station, where Karen Wright and Shawn Jones identified him as the person who had shot Lieutenant Lutz. All four juveniles identified appellant's car. Jason Stevens identified appellant from a photo array and again at trial. Hill and Courtney Ford narrowed their choices down in the photo array, Hill to two photos and Ford to five photos. Both juveniles included appellant's photograph in their choices. Max Ford was unable to positively identify the appellant.
The State presented evidence of tests on the empty shell casings at the scene, as well as the bullet removed from Lieutenant Lutz's body, indicating Lieutenant Lutz had been shot with his own duty weapon. The State also presented evidence of tests on appellant's hands which revealed the presence of gun shot residue. The State presented evidence appellant's tennis shoes matched a foot print found on the seat of the men's restroom broken into at the Certified station. The State produced a blood-stained blanket from Ronald Johnson's home. Analysis showed the blood was consistent with appellant's blood. Lieutenant Lutz's flashlight also had blood on it, consistent with appellant's blood.
In his unsworn statement during the mitigation phase, appellant's version of the events differed from the State's. Appellant admitted being at the Certified station at 4:30 a.m. to get some pop and use the phone. He saw Lieutenant Lutz pull into the Certified station, and went over to talk to him. As they talked, another man ran from behind the station, and the Lieutenant stopped him. The unknown man struck Lieutenant Lutz and appellant went to his assistance. Appellant maintained he struggled with the other man but the other man over powered him, took the officer's gun, and began firing it. Appellant maintained his head wound was caused by a graze from a bullet. Appellant asserted he saw the unidentified man shoot Lieutenant Lutz and run away.
Appellant argued he panicked, fearing because the Lieutenant had phoned in his license plate number, police would assume appellant had committed the robbery and the attack on the Lieutenant. Appellant alleged he went to his home to hide, but when he arrived there, he found the unidentified man from the Certified station accompanied by another person. The two left a pair of tennis shoes and a tire iron in appellant's house trailer. When the police arrived, appellant panicked again and hid in the bushes near his trailer. Appellant maintained he did not break into the Certified station, nor did he shoot the police officer.
 I
In his first assignment of error, appellant challenges the initial, warrantless search of his home, and argues the court should have suppressed all evidence contained in that search, and evidence from warrants issued based on information discovered from the warrantless search.
Appellant was arrested outside his house trailer at approximately 6:30 a.m., and immediately following his arrest, four officers entered his house trailer without a warrant. While in the trailer, one of the detectives observed a tire iron. The presence of the tire iron in appellant's home served as part of the basis to establish probable cause to obtain the search warrant executed on appellant's home.
As appellant correctly points out, warrantless searches are considered per se unreasonable under the Fourth Amendment, other than a few specifically established and well-delineated exceptions, Katz v. United States (1967), 389 U.S. 347. Appellant asserts the search of his home does not fall into any of the exceptions to the warrant requirement. Appellant argues if a search is incident to an arrest, the arrest must take place inside the home, Vale v. Louisiana (1970), 399 U.S. 30. The search may not go beyond the area within the immediate control of the person arrested, Illinois v. Lafayette (1993),462 U.S. 664. At the hearing on the motions to suppress, Lieutenant Sims testified the officers did not enter the home to look for evidence, but spent approximately one minute to make sure there was no one in the trailer. Detective Sims testified at the time the officers did not know how many people were involved in the crime, and because appellant was found in close proximity to the home, the officers needed to determine whether there were other people in the residence who represented a threat to the safety of the officers. A police officer had been brutally shot to death, and his gun was still missing, so the officers entered the home for the limited purpose of conducting a safety sweep. The officer testified they did not look through drawers or in any place too small to conceal a person. They took nothing from the trailer.
The State distinguishes the case at bar from Vale, supra, in that in Vale the suspect was not near the home, nor had he been in the home for some time prior to his arrest. The United States Supreme Court in Maryland v. Buie (1990), 494 U.S. 325, held a search incident to an arrest can be made as a precautionary manner and without probable cause or reasonable suspicion, in the area immediately adjoining the place of arrest from which the officer's safety could be threatened.Buie requires articulable facts which would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual representing a danger to those on the scene.
Likewise, in State v. Lyons (1992), 83 Ohio App.3d 525, the Court of Appeals for Darke County held if the police limit their actions to a quick search of places where someone might be hiding, the sweep is constitutional. Likewise, the Court of Appeals for Cuyahoga County, in State v. Davis (1992), 80 Ohio App.3d 277, found where police believe there are persons present who are known to fire weapons in a house known for drug activity, the police may make a protective sweep to determine how many people are in the home.
Appellant urges law enforcement officers, investigating a fellow officer's murder, were incapable of making an impartial determination, and should have deferred the matter to a magistrate. Further, because the officers used the presence of the tire iron in appellant's home as part of the basis for the later search warrant, all evidence obtained from the residence should have been suppressed as fruits of the poisonous tree,Wong Sun v. United States (1963), 371 U.S. 471.
We have reviewed the record, and we find the officers set forth articulable facts justifying a limited sweep of appellant's trailer for purpose of the officers' safety, incidental to appellant's arrest. We find appellant's arrest so near to the residence, coupled with the nature of the crime of which he was suspected, fully justified the warrantless limited protective sweep.
The independent source doctrine or inevitable discovery doctrine, also allows admission of this evidence. State v.Perkins (1985), 18 Ohio St.3d 193, held evidence obtained illegally is nevertheless properly admitted in a trial court proceeding if it can be established the evidence would have been ultimately or inevitably discovered during the course of a lawful investigation. The State contends, and we agree, the search warrant was obtained not solely on the basis of information related to the protective sweep, but also on other evidence which, taken by itself, would be sufficient to persuade an impartial magistrate to issue a search warrant for appellant's residence.
The first assignment of error is overruled.
 II
In his second assignment of error, appellant argues the State should not have been permitted to introduce evidence of tests on samples of his blood, hair, and fingernail scrapings because they were taken from him pursuant to a warrant which was obtained on the basis of information gathered in the warrantless search of his home.
In Schmerber v. California (1966), 384 U.S. 757, the United States Supreme Court held the Fourth Amendment protects persons against unjustified or improper intrusions into a person's privacy, including bodily intrusion. Appellant cites this argument in I, that the warrantless search of his home was an illegal search, and any warrants obtained on information gathered in the warrantless search were tainted. We have already discussed the legality of the officers' entering his home without a warrant in I, and we have found it did not violate the Fourth Amendment. We conclude the warrant permitting the taking of samples from appellant's body was not tainted by any illegality.
The second assignment of error is overruled.
 III
Appellant's third assignment of error challenges the photo array police used with certain witnesses. Robert Hill and Jason Stevens, two of the juveniles who observed Lieutenant Lutz's murder from the lot next door, were shown photographic arrays comprised of 63 photographs, including a photograph of appellant. At trial, Robert Hill was not asked to make an in-court identification of the appellant, and he did not do so. Hill testified he was shown photographs the day following the murder and selected three photographs he thought most looked like the man he had seen commit the murder. Hill testified before he went to the Sheriffs Department to look at the photos, he had not read anything in the newspaper about the case, had not seen any pictures in the newspaper, and had not watched television coverage of the murder case. On cross examination, in response to a question, Hill testified he believed appellant was the man he had seen shoot the lieutenant. He testified on cross examination he could now identify the appellant because he had dreams and flashbacks about the murder. Hill testified he had been unable to make the identification at the pre-trial suppression hearing.
Jason Stevens made an in-court identification of the appellant on direct examination. He also identified a photograph of appellant which he had earlier selected from a photo array at the sheriff's department. The person who showed him the photographs asked him how certain he was, on a scale of one to ten. Stevens testified his certainty was a five.
Defense counsel closely cross-examined Stevens about the identification. Counsel developed how well Stevens was able to observe the altercation and shooting, and on cross, Stevens admitted at the suppression hearing he was asked to look at appellant and rate appellant on a scale of one to ten as the person who shot the deputy sheriff. Stevens testified he rated appellant about a three on a scale of one to ten, with one being the lowest. Stevens also testified he was unable to pick a photograph of the perpetrator from an array on the day of the crime, although it contained appellant's photograph. Stevens also admitted before he made the identification at the suppression hearing, he had seen appellant's photograph in newspapers, and expected a person accused of the crime to be in the courtroom.
The two other minors who were with Stevens and Hill had been unable to identify appellant at all. On the day of the crime, Courtney Ford was shown a photo array containing a photo of appellant, and she was unable to positively identify the perpetrator. She testified she picked out five photographs which most looked like the assailant, but could not pick out any particular photo as being the man she had seen. Appellant's photo was among the five Courtney selected. Her brother Max Ford saw two photo arrays containing a photograph of appellant, but was unable to identify any.
Appellant correctly alleges the standard to be used for assessing the reliability and constitutionality of any pre-trial identification procedure is set out in Manson v.Brathwaite (1977), 432 U.S. 98. The factors include the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the perpetrator, the level of certainty the witness demonstrated at the confrontation, and the length of time which had elapsed between the crime and the identification. Ohio uses this standard as well, see State v.Broom (1988), 40 Ohio St.3d 277.
Appellant argues the totality of circumstances surrounding Robert Hill and Jason Stevens' photographic and in-court identification of appellant was so suggestive as to undermine the reliability of the identification. Appellant points out both Stevens and Hill saw appellant and photographs of appellant numerous times in photo arrays and in the media before they made their identifications.
Appellant also urges both Stevens and Hill testified when they were asked to review the photo arrays, it was at least implied the suspect's picture was among the photographs in the array. Stevens testified he was told to see if he could identify the suspect and Hill testified he knew the officers wanted him to identify someone in the array.
Appellant argues when a person is shown more than one photo array, a photograph he has seen in the first situation is often remembered in the second. If a witness is informed that one of the photographs is that of the suspect, the likelihood of misidentification is magnified. Appellant urges these facts, compounded by the juveniles' multiple exposures to appellant's photographs and to his person, made the witnesses' identification unreliable, and the court should have excluded them. The State cites Stoval v. Denno (1967), 388 U.S. 293, as authority for the proposition in order to establish a due process violation, the out-of-court confrontation must be unnecessarily suggestive and conducive to irreparable mistaken identification, on the totality of the circumstances.
The State maintains three of the four juvenile eye witnesses did not give an in-court identification of the appellant as the perpetrator. The State also argues Stevens' testimony did not demonstrate any suggestiveness or misconduct.
We find the court did not err in permitting this evidence to be introduced. We find the identification procedures were not unnecessarily suggestive and conducive to irreparable mistaken identification. In addition, the manner in which both the State and particularly the defense developed the juveniles' testimony gave the jury a clear understanding of what the juveniles saw, as well as the degree of certainty with which Stevens made his in-court identification of appellant as the perpetrator. Thereafter, the jury had to weigh the testimony and to determine the credibility of the witnesses' testimony. We find appellant's right of due process was not infringed upon by permitting the jury to hear this evidence.
The third assignment of error is overruled.
 IV
Here, appellant argues the show-up identification procedures used with two of the State's witnesses were unnecessarily suggestive, making them unreliable and inadmissible. The witnesses were Shawn Jones and Karen Wright, the motorists who had been passing by the Certified station at the time of the murder.
Prior to being taken to view appellant, Karen Wright gave a description of the suspect as a white male, six feet tall, stocky, with dark medium length hair and facial hair. She also described his car as an older compact yellow car. Thereafter, officers took Wright to an area close to the scene of the crime, where she saw the police and a gentleman with an officer on either side of him. She recognized the gentleman in the middle as the person she had seen at the Certified station, based upon his build and facial features. Wright testified she did notice appellant had his hand behind his back. She testified she would never forget appellant's face, and was one hundred percent sure he was the perpetrator. Jones also gave a description of the person he saw at the Certified station. He described the person as tall, sort of stocky, with curly hair and a thinnish scraggly beard. Thereafter, officers took him to the show-up identification, where he viewed a person with a lot of other people around. This person had his arms behind his back as if he were handcuffed, although Jones did not see the handcuffs. Jones identified the person he observed as the shooter, based upon his build and facial features. Jones testified the other people around appellant were officers and people not in uniform.
Both Wright and Jones testified none of the officers involved in this show-up identification made any suggestions to the them about the identification. Jones testified he was ninety percent positive of his identification of appellant as the person who shot Lieutenant Lutz.
Appellant urges the totality of the circumstances surrounding this identification procedure forces a conclusion the witnesses' identification was unreliable and should have been suppressed. Appellant cites Stovall v. Denno (1967),388 U.S. 293 as condemning the practice of showing suspects singlely to witnesses rather than as part of a line up. Appellant concedes the show-up identification is not a per se due process violation, but rather, warrants further inquiry.
Appellant points out both Wright and Jones were operating vehicles at the time they observed the crime. As such, their attention was necessarily divided.
Again, a witness' identification of a suspect as the perpetrator of the crime must be suppressed if the show-up procedure used was unnecessarily suggestive and conducive to irreparable mistaken identification, see Kirby v. Illinois
(1972), 406 U.S. 682. The Ohio Supreme Court has agreed due process forbids identifications which are made under conditions which are unnecessarily suggestive or conducive to mistaken identification, see State v. Sheardon (1972), 31 Ohio St.2d 20. In State v. Broom (1988), 40 Ohio St.3d 277, the court held an identification was reliable even though the defendant was the tallest participant in the lineup and dressed in an orange uniform while the others were in gold. The court stressed the witnesses focused their attention on the defendant and displayed a high degree of certainty in their identifications which were very close in time to the crime.
Here, both Wright and Jones identified appellant on the same day the crime was committed. Jones testified at the hearing held January 19, 1996, that he was able to observe the person doing the shooting from a distance of approximately ten feet. He also testified he was ninety percent positive of his identification of appellant as the shooter.
Karen Wright testified at the same hearing she was able to see the shooter's face when she first saw him. When she returned to the scene, the shooter passed so near to her she thought his car was going to hit hers. Wright testified she recognized appellant immediately upon seeing him at the show-up, and also identified appellant's vehicle as the one she had observed at the scene of the crime. Wright testified she was one hundred percent certain of her identification of appellant as the person she saw fighting with the officer and then fleeing the scene after the shooting.
We have reviewed the record, and we note these witnesses' testimony was carefully and throughly developed. We conclude the trial court correctly found the identifications made by Wright and Jones are reliable, and properly admitted them into evidence.
The fourth assignment of error is overruled.
 V
Appellant's challenge to the jury selection process is two fold. Appellant argues the jury was not drawn from a representative cross-section of the community. Further, appellant argues the venire was contaminated by prior knowledge of the facts of the case, of the victim and his family, of appellant, and also by what appellant refers to as the overwhelming community grief experienced as a result of Lieutenant Lutz's death, aggravated by media coverage of the pre-trial hearings and events.
Appellant alleges virtually all of the State's evidence, including eye-witness identification testimony, was reported in detail in the media. The trial court declined to seal the pre-trial hearings, and appellant argues all of the jurors were contaminated by pre-trial knowledge of the evidence. Appellant also argues the media's publication of the pre-trial events insured that the grieving community would form opinions as to appellant's guilt and the appropriateness of the death penalty, resulting in community pressure on the jurors to convict him and to recommend capital punishment.
Appellant complains the trial court limited the scope ofvoir dire, and began the trial on the second anniversary of the murder. Appellant represented to the trial court it would be virtually impossible to seat a fair and impartial jury. Appellant suggests more prospective jurors were called in this case than in the recent prosecution of United States v. TimothyMcVeigh. Where such an enormous number of potential jurors must be examined in order to find twelve impartial jurors in a small rural community, appellant suggests the likelihood the jurors can be fair and impartial is minimal.
Appellant raised this issue in his motion for change of venue. Appellant rightly argues any person accused of a criminal offense is entitled to a trial with evidence properly presented to a fair and impartial jury. See Irwin v. Dowd
(1961), 366 U.S. 717. Appellant concedes a juror need not be totally ignorant of the facts and issues of the case, but can be exposed to publicity if the juror is able to set aside the pre-trial impressions and render a verdict based solely on the evidence presented at trial. See United States v. Johnson (C.A. 6, 1978), 584 F.2d 148.
Appellant argues countless articles were printed in newspapers, and he submitted many to the court as exhibits in support of his motion for change of venue. He suggests Lieutenant Lutz was an experienced and well known law officer. Appellant urges Muskingum County is more susceptible to the effects of grief because of its low homicide rate. Appellant characterizes the headlines in the newspaper articles as sensational, relentless and even inflammatory. Lieutenant Lutz's career, his family life, and his death were detailed, as was appellant's history. Appellant also argues the jurors might be intimidated because of the extensive newspaper coverage, if they rendered a verdict not in keeping with general community sentiment. The widely reported fact that multiple eye witnesses identified appellant as the murderer would be impossible for potential jurors to get out of their minds during the trial, especially given the publication of his prior criminal record. Appellant urges the media attention contaminated the jury pool not just from the standpoint of the guilt phase of the trial, but also the sentencing phase. Appellant argues no one selected from the pool of jurors would be able to freely and independently weigh the mitigating factors. Appellant concludes the resulting prejudice from overwhelming news coverage was compounded because the prejudicial factors combined to give a result greater than the sum of its parts. The cumulative effect thereof, appellant urges, resulted in a pool of jurors unable to overcome outside knowledge, bias, publicity, and grief.
The State replies our standard of reviewing a court's decision on a motion for change of venue is the abuse of discretion standard, see State v. Fox (1994), 69 Ohio St.3d 183. A trial court must examine the totality of local circumstances when determining whether to change the venue of a given case, Irwin, supra, at 721.
The record shows many prospective jurors acknowledged having information about the crime, the victim, and the appellant. The State also points out most of the pre-trial publicity of which appellant complains occurred around the time of the murder. The case did not come to trial until two years later. A number of the prospective jurors represented they had not seen or heard any pre-trial publicity and more asserted they had not been influenced by any publicity.
The State also urges appellant's criticism of the number of prospective jurors called cuts against his arguments. Voir dire
was conducted over a period of more than two weeks, and the State suggests this demonstrates the trial court's resolve to seat the best possible jury. If the court sought a "hanging jury", the State represents the court would have seated the first twelve persons called. As the Supreme Court noted inState v. Swiger (1966), 5 Ohio St.2d 151, voir dire is the best vehicle whereby the court may determine whether a potential juror is unsuited to serve.
The Supreme Court has frequently defined the term abuse of discretion as implying the court's attitude is ". . . unreasonable, arbitrary, or unconscionable . . ." State v.Adams (1980), 62 Ohio St.2d 151 at 157.
We have reviewed the record of the voir dire and the court's rulings in regard to the motion for change of venue, and we commend the court's meticulous dealings in this regard. We find the trial court's attitude was not unreasonable, arbitrary, or capricious, and did not constitute an abuse of discretion in overruling the motion for change of venue.
Regarding appellant's argument, the jury was not drawn from a representative cross-section of the community, in Faye v. NewYork (1947), 332, U.S. 261, the United States Supreme Court held there is a constitutional right to a jury drawn from a group representing a cross-section of the community, including persons with varying degrees of training and intelligence and with varying economic and social positions.
We have reviewed the record, and find nothing therein that would lead us to believe the jury array was not selected from the cross section of the community. Indeed, appellant's remarks regarding the size of the venire would seem pertinent here also.
Next, appellant challenges the court's limitation on thevoir dire of prospective jurors. Appellant argues the court placed limitations which prevented counsel from fully exploring the prospective jurors' biases and denied appellant his right to due process and a fair trial. The scope of voir dire falls within a trial court's discretion, State v. Beford (1988),39 Ohio St.3d 122. Appellant does not elaborate on how the court abused its discretion, other than to assert the court did not permit sufficient voir dire. This is insufficient to convince us the court abused its discretion in this regard.
Next, appellant argues the court applied an incorrect standard in excusing jurors for cause. In Wainwright v. Witt
(1985), 469 U.S. 412, the United States Supreme Court set out the standard for death qualifying a juror: Whether the juror's views would prevent or substantially impair the performance of his duties in accordance with his instruction and oath. Ohio utilizes the Witt standard, see State v. Mills (1992), 62 Ohio St.3d 357. R.C. 2945.25 provides a juror may be challenged for cause in a trial for a capital offense if the juror:
 ". . . unequivocally states that under no circumstances will he follow the instructions of the trial judge and consider fairly the imposition of the sentence of death in a particular case. A prospective juror's conscience or religious opposition to the death penalty is in of itself not grounds for a challenge for cause . . .
Appellant lists fourteen prospective jurors whom he argues the trial court improperly excused. The first, Kelly Moore, was ultimately excused by agreement by both counsel because she had a prepaid vacation to Colorado. The second juror, Paul Romanchek appears to have been excused on agreement of both counsel. The third juror, John Crown, indicated he would have a difficult time considering the death penalty and could not assure the court he could put his feelings aside. Mr. Crown repeatedly stated he could not recommend the death penalty and could only consider some other sanction. At that point, the prosecutor challenged Mr. Crown for cause and defense counsel deferred to the court's judgment based upon the juror's remarks. The court sustained the challenge for cause on Mr. Crown and the defense lodged no objection thereto.
The next juror, John Jardine testified he knew the victim's son, Matt, and had met Lieutenant Lutz himself. He testified he liked him and had stopped by the Lutz home on a couple of occasions. Mr. Jardine asserted it was probably not possible for him to set that aside in appellant's trial. Thereupon, defense counsel challenged for cause and the prosecutor did not oppose excusing Mr. Jardine. The next juror appellant names is Rita Canon. Ms. Canon indicated she had religious objections to the death penalty and would probably vote against it if the trial came to that point. The State asked the juror to be excused for cause and defense counsel deferred to the court's ruling. Virginia Strock, the next person appellant cites, indicated her personal opinion about the death penalty would prevent her from considering it as option for sentencing. In response to questioning, she indicated it was not so much a religious issue, but simply based on "twenty years of soul searching about it". The prosecutor challenged the juror for cause and again defense counsel deferred to the court.
Genevieve Maniaci was voir dired extensively. She indicated her husband was acquainted with the appellant and had an unfavorable opinion of him, although she would try to set that aside. She also indicated her daughter had been in some sort of trouble in the past and the prosecutor representing the State in this case had prosecuted her daughter's case. Mrs. Maniaci indicated she believed her daughter had been innocent and was not treated fairly. She indicated again she would try to set those feelings aside if she were seated in the case. Thereafter, Mrs. Maniaci indicated she had deep misgivings about the death penalty, but could visualize situations where the death penalty was appropriate as long as she was "not the one giving it". The prosecutor challenge for cause and the court excused her over defense counsel's objection.
Marjorie Efaw said her own son was dead and she did not think she could vote for the death penalty to kill another mother's son. Ms. Efaw said she knew appellant was accused of killing someone's son but she simply could not look at appellant's mother and father in the courtroom and vote for the death penalty. The State challenged Ms. Efaw for cause and the defense indicated it had no opposition.
Next, appellant names Patricia Jenkins, who indicated she would not want to be a person who voted for the death penalty, and believed a person was better off in prison for life to live with his guilt. She indicated putting someone to death punishes his family more than the murderer. The prosecutor challenged her for cause and defense counsel did not oppose. William Newsome indicated he had read some of the facts in the newspaper but had no opinion on the appellant's guilt. Newsome felt he could not return a verdict of death for anyone under any circumstances. The prosecutor challenged him for cause and again defense counsel announced no opposition.
Dorothy George is the next person appellant names as improperly excused. Ms. George indicated she had placed a number twelve decal on her car. Twelve was the number of Lieutenant Lutz's cruiser. These decals were displayed by persons as an expression of grief over Lieutenant Lutz's death. Ms. George expressed no opinion about appellant's guilt or innocence but asserted she could not find it within herself to ever convict anyone of any crime whatsoever. Thereafter, the court asked if the parties agreed to excuse her for cause and both prosecutor and defense counsel responded affirmatively. The next person is Enos Dingey who informed the court he had already formed an opinion about appellant's guilt or innocence because he had heard so much about the case and had talked to so many people about it. Mr. Dingey asserted he could not set his opinion aside to render a verdict based on the evidence and the law. He also indicated he did not believe in the death penalty, not only because there was such a delay between trial and execution, but also because he believed it would be a worse punishment to go prison with no possibility of release. The court then inquired of both counsel whether Mr. Dingey should be excused for cause and both the prosecutor and defense counsel said yes.
Jerry Gibson indicated he had been the victim of a crime in 1985, but it would not affect his ability to sit on the case. Although Mr. Gibson expressed no opinion about appellant's guilt or innocence, he indicated he had a very hard time with the death penalty. Gibson was acquainted with some law enforcement officers and had a nephew who was in law enforcement. In response to a question whether that would impact upon his sitting on a case involving the death of a police officer, Mr. Gibson responded consciously he hoped not but subconsciously he just did not know. When pressed, Mr. Gibson indicated he would never be willing to render a death penalty if called upon to do so. The prosecutor challenged Mr. Gibson for cause and defense indicated no opposition. Finally, appellant names alternate juror Wion, who indicated she could consider all potential penalties including the death penalty, but she could not impose the death penalty. The State moved to excuse the juror for cause and defense counsel indicated no opposition.
The failure of an accused to object to an exclusion for cause of a juror who said he could vote for the death penalty constitutes a waiver, see State v. Laskey (1970), 21 Ohio St.2d 187, death penalty vacated in Lashey v. Ohio (1972),408 U.S. 936, citing Stewart v. Massachusetts (1972), 408 U.S. 845 andFurman v. Georgia (1972), 408 U.S. 238 Hence, as to the jurors appellant either did not oppose, or on whom counsel deferred to the court's judgment, appellant has waived any argument here. Regarding Genevieve Maniaci, the only juror in the list who was excused over appellant's objection, it appears to this court there was ample reason in addition to her views on the death penalty for removing her for cause.
Next, appellant argues the court improperly failed to excuse jurors whom he characterizes as unwilling to consider mitigating evidence. Appellant against lists nineteen persons who indicated they would automatically impose a death sentence for murder. The first, Charles Vousin, indicated he honestly believed the murderer should die but would not go against the judge to follow his own feelings. Edward Edwards indicated his Christian beliefs required an eye for an eye and a tooth for a tooth but admitted there might be mitigating circumstances. Mr. Edwards was somewhat acquainted with the victim's son Matt, although he did not socialize with him. Francis Stanton indicated he could follow the law and the instructions given by the court and would consider all potential penalties.
Gregory Parr stated in his opinion the death penalty was necessary for the most heinous crimes but not appropriate in all crimes. He professed himself able and willing to consider all possible sentences, not just one. John Ewald indicated if appellant were found guilty of the murder, the death penalty would be appropriate, but mitigating factors might weigh to some extent. Mr. Ewald stated he would like to think he would be open to listen to both sides of the issue.
Charles Blake said he did not believe the law had any "teeth" behind it and people were not paying the penalty for their crimes. Mr. Blake saw a Biblical justification for the death penalty and believed the death penalty would be most appropriate choice. He indicated defense counsel would have to convince him not to impose capital punishment. Mr. Blake did indicate circumstances could sway him from the death penalty.
Pamela Teetz indicated she believed there were circumstances where the death penalty would be appropriate and circumstances where it would not. Ms. Teetz was closely examined by what circumstances she would consider would mitigate the penalty.
Joyce Alesandrini had a nephew in a pending criminal case and her husband's cousin was a deputy sheriff. Ms. Alesandrini indicated the death penalty was a very difficult issue for her. In her youth she was completely opposed to it, although she has modified her opinions over time. Ms. Alesandrini indicated although she believed the death penalty deterred crime, many different sorts of circumstances would weigh as mitigating factors in her mind.
Judy Schaefer is next on appellant's list. She was excused by agreement of both counsel after stating she would only consider the death penalty for "blatant murder." Although defense counsel did not object to Cynthia Bachos being seated, counsel argued to the court she was a firm believer that the death penalty was the only punishment for murder. The court reminded defense counsel Ms. Bachos indicated she would weigh the mitigating factors, and defense counsel responded, ". . . whatever, Judge . . ." Wanda Grant declined to give an opinion about attorneys, but indicated she could set her feeling about them aside and give the appellant a fair trial. She indicated if the evidence demonstrated the appellant deserved a less severe penalty than capital punishment, she could vote accordingly. Ms. Grant indicated as a tax payer she resented having to ". . . foot the bill to maintain persons in jail, but would do the honest thing . . ." The court and defense counsel discussed this juror at length, and the court found she had rehabilitated herself several times during the dialogue. The court also noted both counsel were asking the jurors hypothetical questions without any facts to go with them, which made it difficult for the jurors to answer.
Linda Erwin admitted she had been exposed at work to a lot of strong opinions appellant should pay with his life if he were found guilty. Ms. Erwin indicated if she had no reasonable doubt about guilt, she would impose the death penalty and could not consider mitigating factors. Defense counsel challenged Ms. Erwin for cause and the prosecutor did not oppose this. Clint Callaway indicated he had no information whatsoever of what the case was about and had not realized the death penalty might be involved. Mr. Callaway believed the death penalty was pretty good because the tax payers otherwise have to keep murderers for years and years. Mr. Callaway indicated his first choice would be the death penalty because people are responsible for what they do, but depending upon the mitigating factors, he would be able to keep an open mind as to all potential penalties. Mr. Callaway rejected a number of suggested mitigating factors, but indicated if he did not believe appellant deserved the death penalty, he would have no problem with life imprisonment even if he did not like having to pay for it. Mr. Callaway did indicate if he believed beyond a reasonable doubt the appellant had killed a police officer, he would not really consider any thing but the death penalty. Thereupon, defense counsel challenged for cause, and the prosecutor lodged no objection. The court excused this juror for cause.
Mindy Smallwood was also excused for cause by agreement of counsel after she indicated the only appropriate penalty for murder would be the death penalty, and there were no possible mitigating factors. Elmer Lentz believed strongly in the death penalty and indicated he could not consider mitigating factors. The record indicates the court excused Lentz for cause by agreement of counsel. Emily Meyers indicated she believed in the death penalty if, for example, the crime involved the death of an officer or a small child. Ms. Meyers indicated she would vote for the death penalty if she found appellant guilty of murdering Lieutenant Lutz. Defense counsel asked this juror no questions and challenged her for cause. Upon the agreement of the prosecutor, the juror was excused. Donald James was excused for cause upon the defense's motion with no opposition from the State. James Kannal was excused upon defense counsel's vehement challenge, to which the State agreed.
Russell Taggart indicated the only choice would be the death penalty and he was also excused for cause upon defense's motion, in which the State joined. Finally, Glenda Bryan, was also removed for cause upon the defense's motion and the State's agreement, because Ms. Bryan indicated she could not look at any mitigating factors, and believed if appellant was guilty, the only possible sentence was death.
Misty Josselyn knew who Lieutenant Lutz and his son Matt were, but did not know them personally. Josselyn stated she had no strong feelings in favor of, or against, the death penalty. She became upset when closely and repeatedly questioned. The court did not excuse Josselyn.
Appellant concedes some of the jurors were excused by stipulation. Certain other persons were actually removed for cause upon defense motion. We find those persons retained as prospective jurors did not express themselves unwilling to weigh mitigating factors in the sentencing phase.
Next, appellant argues Catherine Decker was improperly removed for cause upon the State's motion. The State challenged her because she was a pharmacist and the defense indicated the possibility of calling a pharmacologist to testify. Defense opposed removing the juror for cause, and asked the court to place on the record why Ms. Decker would be removed. The court indicated it felt Ms. Decker fluctuated back and forth on the issue of the death penalty, and should be removed for this and not so much because she was a pharmacist and might influence jurors one way or another. Although at one point, counsel indicated he would defer to the court's judgment on the State's challenge, after the court gave its reasons for excusing the juror, the defense objected. We find no error in the removal of Ms. Decker.
Appellant also argues the way voir dire progressed makes it obvious both the prosecutor and the trial court sought commitments from the prospective jurors that they would impose the death penalty in this case. The State points out in Statev. Allard (1996), 75 Ohio St.3d 482, the Ohio Supreme Court approved a similar voir dire, noting where defense counsel closely inquires into each prospective juror's belief and opinions concerning the death penalty, there is no reversible error. Our review of the voir dire leads us to conclude the court did not commit error in its questions, nor in the questions the court permitted the prosecution to ask.
Next, appellant argues the court failed to excuse certain jurors who indicated they knew a great deal about the crime, the victim, and/or the appellant. Once again appellant lists eight persons. The first is Mary Hahn, who indicated her husband's niece is married to Lieutenant Lutz's nephew. Ms. Hahn indicated she did not think this would influence her as a juror. Upon the court's inquiry, defense counsel did not challenge this juror for cause. The next juror was Linda Edwards, who was also not challenged for cause although appellant's sister is married to her brother-in-law's brother. The third person on the list, Jill Strickdorn, was not challenged by either the prosecution or defense after she indicated she had heard people talking about the murder every place she went.
Juror Ronald Beech, indicated he was friends with Lieutenant Lutz's niece, Cathy and socialized frequently with her husband Greg. Mr. Beech indicated the fact he knew these people would not influence him. Beech felt he could address the case on its merits and according to his own conscience. Mr. Beech indicated he was aware of the facts of the case through television, newspaper, and generally living in the town. Mr. Beech was not challenged for cause by either the prosecutor or defense counsel. Stephanie Darby heard four or five friends indicate they believed appellant was guilty. Defense challenged Ms. Darby for cause because she allegedly violated her oath in talking to these friends after she had been called for jury duty. The court found she did not violate her oath. The court overruled defense's challenge for cause on Ms. Darby.
The defense challenged Daniel Jennings because Jennings had what defense counsel characterized as "impersonal contact" some twenty years before with the victim. Defense asked the court not to seat someone who had a favorable impression about the victim, and the court overruled the motion for cause. The defense challenged Edward Edwards because he had strong religious beliefs, displayed a number twelve decal on his vehicle, had worked in security, contributed to Lieutenant Lutz's memorial, and was acquainted with the victim's son Matt. The court overruled the challenge for cause without comment.
Crim. R. 24 sets forth the reasons a person may be challenged for cause. A juror may be removed because of previously formed or expressed opinion about the guilt or innocence of the accused, unless the court is satisfied the juror can be impartial. Our standard of reviewing a trial court's ruling on a challenge for cause is to defer to the court's discretion ". . . unless it is manifestly arbitrary and unsupported by substantial testimony to constitute an abuse of discretion . . .", see State v. Wilson (1972), 29 Ohio St.2d 203.
We have reviewed the record, and we find there is no demonstration of abuse of discretion in a way the court conducted voir dire and ruled on the challenges for cause. We further find those excused by stipulation were properly excused.
Finally, appellant argues the trial court erred in failing to sequester the jury throughout the trial. Appellant concedes the decision to sequester is within the sound discretion of the trial court, State v. Broom (1988), 40 Ohio St.3d 277. The court overruled appellant's motion to sequester the jury. Appellant argues the jury was contaminated by the extensive publicity surrounding the case, as well as pressure from the community. The record indicates the court gave the necessary admonitions to the jury.
In conclusion, we have closely examined the voir dire, and we find the trial court took the necessary actions to ensure the jury which was seated could give appellant a fair trial. We find no error therein.
The fifth assignment of error is overruled.
 VI
In his sixth assignment of error, appellant argues the court should have excluded evidence appellant had experience with crack-cocaine. Appellant urges this tended to persuade the jury to convict him based upon his bad character, rather than on the evidence of his guilt.
R.C. 2945.59 and Evid. R. 404(B) govern the admission of other acts evidence. Evid. R. 404 prohibits the admission of evidence of other crimes, wrongdoing, or acts to prove the character of the person in order to show the person acted in conformity therewith. The rule does permit admission of the evidence for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
In State v. Curry (1975), 43 Ohio St.2d 66, the Ohio Supreme Court held evidence is inadmissible if it shows an accused has committed another crime which is wholly independent from the offense for which he is on trial. Appellant concedes the State used the information about the crack-cocaine in attempting to prove appellant had been at Ron Johnson's house with the murder weapon. Appellant argues the purpose of his visit to Johnson's home was irrelevant to the issue of appellant's guilt. The State responds the evidence was properly admitted to show the identity of the suspect, and how the murder weapon was retrieved by local law enforcement personnel.
We find the evidence is admissible under the Rules of Evidence. Accordingly, the sixth assignment of error is overruled.
 VII
Appellant next argues the evidence presented at trial deprived him of any chance of a fair trial. The first evidentiary error of which appellant complains is the admission of cumulative gruesome photographs. Appellant argues the State presented numerous gruesome and repetitive pictures and photographic slides which were unrelated to the issue of causation.
Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if they are relevant and of probative value in assisting the jury to determine the issues, or if the pictures are illustrative of the testimony and other evidence, so long as the danger of the prejudice is outweighed by the probative value, and the photos are not repetitive or cumulative in number, State v. Maurer (1984), 15 Ohio St.3d 239, syllabus by the court, paragraph seven.
The jury was shown nine photographic slides of Lieutenant Lutz's body, over defense counsel's objection. Appellant argues he stipulated to cause of death, and the photographs added no probative value to the coroner's testimony. Appellant maintains the photos were introduced to inflame the jury's passion. We find the autopsy photos used to illustrate the coroner's testimony are of probative value.
Appellant argues the effect the gruesome photographs of the victim was compounded when the court admitted photographs of appellant taken after the arrest, showing him shirtless, bleeding from wounds, and in a distressed state. Although appellant characterizes these pictures as irrelevant, we find they are illustrative of the circumstances, and tend to support the witnesses' testimony.
Appellant next challenges the admission of evidence and tests without a proper chain of custody. Appellant argues the State was permitted to introduce numerous exhibits related to scientific testing, along with the results of the testing. Appellant argues the State did not prove the chain of custody of the items. The evidence to which appellant refers is the flashlight found at the scene of the crime, and the atomic absorption test performed on appellant's hands.
Addressing the flashlight first, the officer who first gathered the flashlight as evidence at the scene of the crime admitted he had not followed procedures by putting on fresh latex gloves prior to picking up each piece of evidence. The flashlight eventually went to the FBI for testing. The examiner who testified indicated the tests performed on the flashlight were negative for blood or other material which could be analyzed for DNA. Thereafter, the flashlight was sent to Cellmark Laboratories. The technicians at Cellmark were able to find blood on the flashlight and to determine by DNA testing that the blood was consistent with appellant's DNA.
In performing all these tests, all of the samples were consumed and the defense had nothing available for its own tests.
The State responds all these issues have nothing to do with chain of custody, but are issues which go to the weight and credibility of the evidence.
We have reviewed the record, and we find no flaw in the chain of custody established at trial. The issues regarding the flashlight were brought to the jury's attention at trial.
After he was arrested and taken to the hospital for treatment of his wounds, appellant submitted to an atomic absorption test. The test indicated traces of antimony and barium consistent with gun shot residue. Defense counsel objected to the experts from the Bureau of Criminal Investigation who testified regarding the test. Appellant argues neither Donna Rose or James Lynn, both from BCI, were qualified to conduct the testing. Appellant argues their testimony simply gave the prosecution an aura of scientific expertise with which to accuse appellant.
We have reviewed the record, and it appears the prosecution offered into evidence Ms. Rose was a forensic scientist in the microanalysis department primarily assigned to atomic absorption for gun shot residue. She held a BS in Environmental Science and completed a one year medical technology internship. She had had a six month on-the-job training at BCI. She had run over 1000 atomic absorption tests herself with various machines. The court found she was qualified to testify.
Jeffrey Lynn also testified to his seventeen years experience with BCI in the area of microanalysis. Mr. Lynn also had a BS degree and specialized training in regards to the atomic absorption test, of which he had run literally thousands. The court qualified Mr. Lynn as an expert.
The trial court determines if a person qualifies as an expert, and a reviewing court may not reverse the trial court's decision absent a clear abuse of discretion, State v. Maupin
(1975), 42 Ohio St.2d 473. We find the trial court did not abuse its discretion in permitting these witnesses to testify as expert witnesses.
The seventh assignment of error is overruled.
 VIII
Appellant next challenges four instructions given the jury during the trial phase, which appellant claims were erroneous. The first of these is the court's definition of causation and purpose.
Appellant correctly argues under Ohio law the jury must find specific intent to cause the death of the victim in order to convict for aggravated murder, R.C. 2903.01. The court instructed the jurors appellant did not have to foresee injury to a specific person or injury in its precise form, but appellant was responsible for causing any foreseeable consequence that flowed from an unlawful act. Appellant argues this relieves the state of the burden to prove mens rea, which violates appellant's right to due process.
The State replies the court gave both the statutory definition of purposeful and the Ohio Jury Instruction definition. The court instructed the jury as follows:
 Purpose to kill is an essential element of the crime of aggravated murder.
 A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there were present in the mind of the defendant specific intention to kill Lieutenant Michael Lutz.
 Purpose is a decision of the mind to do an act with a conscious objective or producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself, unless he expresses it to others or indicates it by his conduct.
 The purpose with which a person does an act is determined from the manner in which it is done, the means or the weapon used and all the other facts and circumstances in evidence.
The court went on to instruct the jury that no person could be convicted of aggravated murder unless that person specifically intended to cause the death of another. The court went on to instruct the jury it was sufficient for this element of the offense if the jury found the appellant actually formed a purpose to cause Lieutenant Lutz's death.
We find no error in the court's instruction on purpose.
Next, appellant argues the court gave an incorrect charge on reasonable doubt. Appellant concedes the court gave the statutory description of reasonable doubt over appellant's objection. Appellant argues the statutory definition of reasonable doubt is constitutionally inadequate because it embodies a standard of proof below that required by the United States and Ohio Constitutions.
The State charged the jury:
 ". . . reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs depending on moral evidence is open to some possibility or imaginary doubt. Proof beyond a reasonable doubt is a proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs. . . . ."
Appellant argues the "firmly convinced" language represents only the clear and convincing evidence standard, and not the beyond a reasonable doubt standard. Appellant also challenges the "willing to act" language as too lenient to satisfy due process. Nevertheless, the Ohio Supreme Court has approved the use of the statutory definition of reasonable doubt in jury instructions, see State v. Awkal (1996), 76 Ohio St.3d 324. In fact, as appellant points out, our Supreme Court has suggested that it is inadvisable to enlarge upon that definition, seeState v. Van Gundy (1992), 64 Ohio St.3d 230.
Next, appellant challenges the court's definition of what appellant characterizes as critical terms in the specifications. In the third specification, the trial court did not define the term "escaping detention" to the jury. The State responds the phase is self-explanatory and appellant failed to bring this alleged deficiency to the court's attention. Appellant also argues the trial court failed to require unanimity from the jury on the escaping detention specification. The State urges any error in this instruction was harmless because the jury did return unanimous verdicts.
Finally, appellant argues the court gave the jury an incorrect instruction on presumption. The court instructed the jury if a wound was inflicted upon a person with a deadly weapon in a manner calculated to destroy life, it could infer the purpose to kill from the use of the weapon. Appellee argues this is not an instruction on presumption but on purpose, and we agree. We further find it is a correct instruction on purpose.
Finally, appellant argues he requested an instruction on the term "principal offender." We have reviewed the record, and neither the State nor the defense alluded to any accomplice. The State argues because the jury found appellant guilty, it must have found appellant was the principal offender because there was no other person. We agree.
We have reviewed the jury instructions, and find them to be a correct statement of Ohio law. We find the trial court's instructions did not deprive appellant a fair trial.
The eighth assignment of error is overruled.
 IX
Appellant was convicted of two counts of aggravated murder and three statutory aggravating circumstances on each count, which he argues was inappropriate because there was one victim and a single act. In addition to the specification the victim was a law enforcement officer, appellant was convicted of the specification that the murder was committed during the course of an aggravated robbery and for the purpose of escaping detection for the offense. Appellant asserts these specifications are duplicative.
The State points out the court instructed the jury to render separate verdicts on each count and to consider the aggravated circumstances for each count individually, not combining aggravating circumstances from different counts.
Appellant argues the State failed to "actually merge" all the specifications, to his prejudice. He argues a proper merger would have resulted in one count of aggravated murder with two specifications. Appellant concedes a person may be prosecuted and found guilty of two alternative theories of aggravated murder, but cannot be sentenced for both, see State v. Osborne
(1976), 49 Ohio St.2d 135, death penalty vacated in Osborne v.Ohio (1978), 436 U.S. 586, on other grounds.
We have reviewed the record, and we find appellant's claim the specifications were not "actually merged" is not well taken. We find no error herein.
The ninth assignment of error is overruled.
 X
Next, appellant challenges twelve of the trial court's instructions given to the jury at the penalty phase, asserting the instructions did not adequately define the jury's discretion in choosing to impose the death penalty. As appellant very correctly points out, the jury's discretion must be properly guided in order to ensure its sentencing determination is reliable, rather than arbitrary and capricious, Gregg v. Georgia (1976), 428 U.S. 153. Appellant urges the jury instructions at the penalty phase, taken both individually and cumulatively, failed to guide the jury's discretion and resulted in a death verdict that was not the result of a reliable sentencing procedure.
At the outset, appellant argues the court failed to give the jury any instruction at the commencement of the penalty phase to inform the jury of the nature of the proceedings and how to consider the evidence. Appellant urges R.C. 2929.03 and 2929.04 set out a procedure to be followed when the State seeks the death penalty, and the procedures must be strictly adhered to, see State v. Wogenstahl (1996), 75 Ohio St.3d 344.
We have reviewed the statutes appellant cites, and those statutes do not require the court give the jury any instructions such as appellant suggests at the commencement of the penalty phase.
Next, appellant argues the court did not properly define the term "mitigating factor" or "mitigation" to the jury. The court did instruct the jury ". . . mitigating factors are factors that, while they do not justify or excuse the crime, nevertheless in fairness and mercy, may be considered by you as extenuating or reducing the degree of the defendant's punishment. . . ." Appellant objected to this instruction.
The State points out the court also instructed the jury that the lack of mitigating factors does not require the jury to recommend death.
We have reviewed the record, and we find the terms mitigating factor and mitigation were properly defined.
Next, appellant argues the court erred in permitting the jury to consider evidence which was not relevant to the penalty phase. The court, on the State's motion, admitted all of the trial phase evidence and exhibits. The State challenges this assertion, arguing that it is not supported by the record.
A court may properly allow the admission in the penalty phase of all or much of what occurred in the guilt phase, because the prosecutor must demonstrate beyond a reasonable doubt the aggravating circumstances outweigh the mitigating factors, seeState v. Woodard (1993), 68 Ohio St.3d 70. Woodard held exhibits are admissible if relevant to the death penalty specifications of which the defendant was found guilty, and if relevant to the nature of the offense.
We find the trial court did not err in admitting this evidence into the penalty phase of the trial.
Fourthly, appellant argues the trial court should have given his proposed jury instructions on mercy and sympathy. Appellant concedes that in State v. Lorraine (1993), 66 Ohio St.3d 414, the Supreme Court of Ohio held mercy is an arbitrary and irrelevant factor in capital sentencing. Appellant concedes we are bound by the Supreme Court's directives.
Next, appellant argues the trial court relieved the jury of its responsibility for its verdict by instructing the jury its recommendation was merely a recommendation which the court could accept or reject. Appellant argues the Supreme Court has directed no reference be made to the jury regarding the finality of its decision, see State v. Buell (1986), 22 Ohio St.3d 124. Suggesting a jury verdict is only a recommendation misleads a jury about how seldom a trial judge actually rejects the jury's recommendation, see State v. Durr (1991), 58 Ohio St.3d 86.
The State replies the court gave the standard OJI instructions, which contain the word recommendation.
We have reviewed the court's charge to the jury during the penalty phase, and we find the trial court's instruction to the jury did not mislead it into a diminished feeling of responsibility for its deliberations and ultimate verdict.
Next, appellant argues the trial court's instructions did not properly allocate and define the burden of proof for the penalty phase of the trial. First of all, appellant argues R.C.2929.03, 2929.04, and 2929.05 violate the principles of due process.
Appellant argues R.C. 2929.03 puts the burden of going forward with evidence of mitigating factors on the accused, and if the accused does not raise mitigating factors, the death penalty becomes mandatory. Appellant argues this results in an arbitrary and capricious sentencing scheme where two persons in similar circumstances can be sentenced to grossly different penalties.
We do not agree with appellant that if an accused does not come forth with mitigating factors, then the death penalty becomes mandatory. A jury is always free to reject the death penalty and chose a lesser penalty, as is the trial court. In fact, the trial court here instructed the jury that the lack of mitigating factors does not mean the death penalty should be imposed.
Appellant also argues the standard of proof, beyond a reasonable doubt, is insufficient in a capital case. Appellant asks us to adopt instead a standard of proof beyond all doubt. We cannot reject the "beyond a reasonable doubt" standard which the Supreme Court has always applied.
Appellant requested a jury instruction on residual doubt. InState v. McGuire (1997), 80 Ohio St.3d 390, the Ohio Supreme Court rejected residual doubt as an acceptable mitigating factor and we are bound by the Supreme Court's decision.
Appellant also argues the court should have instructed the jury it need not unanimously reject the recommendation of death before proceeding to consider the life sentences. Appellant argues the court instructed the jury it is required to first unanimously reject the death penalty before proceeding to consider any other penalty. Actually, the trial court instructed the jury it must unanimously agree on whichever penalty it recommended to the court. The court did not instruct the jury it had to first consider the death sentence, and reject it unanimously, before it could consider sparing appellant's life.
Appellant also argues the court failed to give an instruction that appellant would be ineligible for parole if the jury rejected the death sentence. In fact, the court informed the jury it had three possible penalties to consider, the one being the death penalty, the second being life in imprisonment without the possibility of parole for thirty years, and the third being life in imprisonment without the possibility of parole for twenty years. Appellee suggests the jury instruction is self-explanatory and unequivocal. We agree.
Appellant next argues it was inappropriate for the court to instruct the jury that it must consider any factor relevant to the issue of whether the defendant should be sentenced to death. Appellant argues the court did not define mitigating circumstances so as to address the factors calling for a penalty less than death. Appellant also argues this instruction provided no guidance as to what the jury could consider a mitigating factor.
We have already held supra, the court's instruction on the mitigating factors was sufficient.
Finally, appellant requested the court instruct the jury it had a fourth sentencing option pursuant to R.C. 2929.03 as effective July 1, 1996. Appellant asked the court to instruct the jury it could recommend a sentence of life imprisonment without any possibility of parole. Appellant concedes the crime of which appellant was charged was committed in 1994, but the trial did not actually commence until after the effective date of the amendment.
In State v. Rush (1998), 83 Ohio St.3d 53, the Ohio Supreme Court held the amended sentencing provisions are applicable only to crimes committed on or after the effective date, and not to crimes committed before the effective date even if sentencing occurs afterward.
In conclusion, we have reviewed the jury instructions given at the penalty phase of appellant's trial, and we find the instructions gave appropriate guidance to the jury as to the process and its role in it. As such, we conclude the jury instructions did not deny appellant's rights to due process, a fair trial, and a fair and reliable determination of sentence. Accordingly, the tenth assignment of error is overruled.
 XI
Appellant next asserts the highly charged emotional atmosphere surrounding his trial prejudicially affected his ability to receive a fair trial. Appellant argues he was tried in a small town where everyone knew the victim or a member of his family. Appellant argues the voir dire indicates most of the jurors seated had personal feelings about the victim or the family or had personal grief which they had to try to set aside. Pre-trial media coverage had been extensive.
Appellant argues once the State commenced its case, there was unnecessary and pervasive victim impact evidence. The State opened its case with testimony to establish the cause of death, including autopsy photos of the victim. The jury learned Lieutenant Lutz's son Matt, who is also a police officer, had gone to the scene of the crime to see his father. Appellant urges this was completely irrelevant to any legitimate issue in the case. Appellant also argues a number of the witnesses who testified were very upset as they gave their testimony. The prosecution presented Lieutenant Lutz's blood soaked clothes, which had not been stored properly and had a foul smell. The State introduced Lieutenant Lutz's broken glasses and dentures.
The State responds the evidence presented was relevant to the issues at trial, and it was understandable that many of the eyewitnesses were extremely upset. The State argues the use of the victim's clothing, glasses and dentures depicted the nature of the struggle between the victim and his assailant, and the nature of Lieutenant Lutz's death.
It is difficult to conceive of an aggravated murder trial that does not include an element of strong emotion. This court has extensively reviewed the record, and we find this evidence, while admittedly conveying some sense of the victim impact, was necessary under the facts of this case.
The eleventh assignment of error is overruled.
 XII
In his twelfth assignment of error, appellant challenges the sufficiency of the evidence presented by the State. Appellant moved for acquittal on all counts and specifications at the close of the State's case, and at the end of all the evidence. Appellant argues there was insufficient evidence upon which to predicate a conviction for aggravated murder, aggravated robbery, or any of the statutory aggravating circumstances. Appellant urges there was no evidence of prior calculation and design or purpose, or intent. Appellant asserts the State did not present sufficient evidence for the jury to find he was the perpetrator of any crime.
In State v. Thompkins (1997), 78 Ohio St.3d 380, the Ohio Supreme Court instructed us about the similarities and the distinctions between the concepts of manifest weight and sufficiency of the evidence. The Supreme Court noted the distinctions are both qualitative and quantitative. Sufficiency of the evidence refers to the legal standard which is applied to determine whether the evidence is legally sufficient to support a verdict as a matter of law, Thompkins, at 386, citations deleted. Sufficiency of the evidence is directed to the trial court's review of the applicable law, and a trial court should not enter a judgment of acquittal unless the evidence is such that reasonable minds can reach different conclusions as to whether the State has proved each material element of the crime beyond a reasonable doubt, see State v.Bridgeman (1978), 55 Ohio St.2d 261.
Even if a judgment is sustained by sufficient evidence, the judgment may nevertheless be against the weight of the evidence, because weight of the evidence concerns the amount of credible evidence offered in a trial in support of one side of the issue. Thompkins, supra. Weight of the evidence and credibility of the evidence are matters for the jury's resolution, see State v. DeHass (1967), 10 Ohio St.2d 230. A reviewing court may not reverse the jury's verdict if it finds there was competent and reliable trial. Ohio utilizes theStrickland test, see State v. Bradley (1989), 42 Ohio St.3d 136.
Appellant's list of counsel's deficiencies include failure to investigate, failure to properly object to and limit the State's presentation, failure to properly enter objections and properly litigate issues on the admissibility of evidence, failure to conduct a meaningful voir dire, and failure to investigate and present available defenses and mitigation factors.
Appellant asserts counsel failed to conduct a thorough and on-going investigation prerequisite to any type of intelligent and informed decisions relating to the defense of a criminal case, particularly a capital prosecution. Appellant fails to elaborate on this assertion, and this court cannot find anything in the record to substantiate this argument.
Appellant argues counsel failed to secure suppression of a pair of incriminating tennis shoes officers seized from his trailer without a warrant. The shoes were later introduced as evidence placing appellant in the Certified restroom. We have already discussed both the warrantless and the warrant search of appellant's residence. Defense counsel did include the tennis shoes in his unsuccessful motion to suppress evidence, and we have found the evidence was properly admitted.
Appellant complains of his counsel's failure to fully review all the reports and documents provided from the FBI, BCI and Cellmark Laboratories. Specifically, counsel did not pursue an FBI finding of several fingerprints at the crime scene which did not belong to appellant or the victim. The FBI also found blood of unknown origin on the murder weapon and on Lieutenant Lutz's hands. The report also found no transfer of hairs or textile fibers from appellant to Lutz. Appellant's attorneys did not offer this report into evidence. Appellant characterizes this evidence as clearly exculpatory.
The record contains a strenuous cross-examination by defense counsel regarding the fingerprints, the blood found on the murder weapon, and on Lieutenant Lutz's hands. Although defense counsel did not actually introduce any of this evidence in the defense case in chief, counsel explored this evidence closely in cross-examination and argued it strenuously.
Appellant also argues counsel did not request funds to employ and use expert witnesses to challenge the reliability of the testing procedures and results. Our review of the record leads us to conclude defense counsel explored and used many resources in conducting of appellant's defense.
Appellant also argues defense counsel did not demand a detailed and descriptive Bill of Particulars when the Bill of Particulars provided by the State provided insufficient information. Given the amount of discovery in this case, we find this was unnecessary.
Appellant challenges the conduct of his counsel duringvoir dire. We have already addressed voir dire extensively, and found it proper. We have already rejected appellant's argument counsel should have challenged the jury array because it was not drawn from a fair cross section of the community. Counsel also did not obtain a change of venue, but the record demonstrates counsel were vigorous in their attempts to obtain a change of venue. Further, we have found the venue was proper,supra.
Appellant maintains that counsel failed to investigate and prepare for the cross examination of the State's witnesses, but this assertion is belied by the record, wherein counsel effectively explored the weaknesses of the State's case.
Next, appellant argues on numerous occasions counsel waived appellant's presence in the proceedings without first obtaining appellant's personal waiver on the record. The situation to which appellant refers, was a situation where the court gave prospective jurors a witness list so they could see whether or not they knew any potential witnesses. Although the court did this outside of the presence of defense counsel, defendant, and the State, it was made part of the record, and we see no infringement of appellant's rights therein.
Appellant argues his counsel failed to secure suppression of the eyewitness identification testimony and did not present expert testimony necessary to demonstrate to the jury the eyewitnesses were unreliable, particularly given the effect of the show up and photo array identification procedures. We have already found no error therein.
Appellant complains his counsel failed to suppress a statement he made at the hospital. The State replies the statement was not used in the State's case in chief, but in rebuttal in the penalty phase of the proceeding. We find this evidence was properly admitted. Appellant argues counsel should have obtained an order sealing the pre-trial hearing to prevent undue pre-trial publicity. Counsel sought such an order, and the court refused. Counsel also failed to object to the trial starting on the second anniversary of the crime. We have already discussed and rejected this as having no impact on the trial.
Counsel did not employ a jury selection expert, and appellant argues this resulted in counsel who were inadequately prepared to conduct a thorough voir dire. We have already extensively discussed why we find the voir dire was proper.
Appellant argues his counsel failed to object to the inflammatory other acts evidence presented by the State, and to the highly emotional testimony from Deputy Sheriff James Peadon. We have already discussed these alleged errors and rejected them. Appellant argues counsel did not present a viable defense or theory of mitigation, did not present a complete history of appellant's psychological background, and did not adequately counsel appellant about the content of his unsworn statement given to the jury at the penalty phase of his trial. The State replies defense had expert assistance and conducted the trial according to sound defense strategy. We agree defense counsel faced numerous difficult decisions throughout this trial, and this court was unable to discover any flaw in the defense.
Appellant argues counsel failed to advise the court there was serious jury misconduct both at the trial phase and at the penalty phase. This will be discussed infra. Finally, appellant argues he repeatedly challenged counsel to conduct the trial in a different manner. Appellant alleges counsel consistently refused to address his complaints and thereby denied him the effective assistance of counsel.
We have reviewed the record, and we find no deficiency in counsel's performance which would impair appellant's ability to receive a fair trial.
The thirteenth assignment of error is overruled.
 XIV
Appellant argues various jurors committed misconduct both during the guilt phase and penalty phase. Appellant argues his nephew brought to the court's attention one of the jurors was overheard at a party discussing the case and offering the opinion appellant was guilty. In fact, the court interviewed the juror in question, who denied there was any discussion about the case or how the juror felt about the case. Based upon this, the court declined to remove the juror.
During the penalty phase deliberations, the jury foreman sent a note to the trial court expressing misgivings about the manner in which one alternate juror expressed his feelings about the others. Over the objection of the State, two courtroom bailiffs were sworn in and testified the foreman told each of them the alternate was throwing pens and things at some of the other jurors. Appellant argues the court should have questioned the jurors about the deliberation process to determine whether undue pressure was applied to some of the jurors and whether the deliberations were conducted in an orderly manner.
The foreman indicated to the court both jurors allegedly pressured by the alternate said they did not feel pressured.
In any jury case, and particularly in a capital case, there are necessarily tensions present in the jury room. It appears the trial court intervened to the extent necessary to ascertain there was no misconduct in either the guilt phase or penalty phase of this trial.
The fourteenth assignment of error is overruled.
 XV
Next, appellant challenges his conviction and sentence, arguing the cumulative effect of all the errors throughout both phases of the trial, the pre-trial preparation, post-trial motions, and the appellate process acted to deny him due process. Appellant reiterates the substance of his challenges to the pre-trial, trial, and post-trial conduct of his case. We have found no error therein supra, and accordingly we overrule the fifteenth assignment of error.
 XVIII
Here, appellant challenges the Ohio death penalty sentencing scheme on constitutional grounds. Appellant complains that he is unable to fully explore this argument given this court's restrictions on the length of briefs. However, appellant also concedes the Supreme Court has repeatedly found Ohio's death sentence scheme does not violate the United States or Ohio Constitutions, or international law. Appellant also concedes this court is bound by the decisions of Ohio Supreme Court, but he raises these arguments in order to preserve them for further review.
Because we agree with appellant the Ohio Supreme Court has disposed of these issues, we overrule the eighteenth assignment of error.
 XVI and XVII
Assignments of error XVI and XVII discuss R.C. 2929.05. The statute requires us to undertake a three-part analysis of a capital case. First, we address the assignments of error raised by the appellant in regard to the proceedings in the trial court. If we find no reversible error, we must proceed to independently weigh the aggravating circumstances against the mitigating factors. Finally, we must then independently consider whether appellant's sentence was disproportionate to the penalty imposed in similar cases. Insofar as appellant challenges the constitutional sufficiency of the statute, the Supreme Court has found it sufficient.
 INDEPENDENT ASSESSMENT OF APPROPRIATENESS
We find the State proved the aggravating circumstances beyond a reasonable doubt. Appellant offered lengthy evidence in mitigation of the death sentence. Appellant addressed the jurors in an unsworn statement. Appellant explained to the jurors why he did not testify, because he believed the physical evidence which the State had gathered excluded him as a suspect. Appellant also represented he believed the eyewitnesses were not credible. Appellant told the jury he was 42 years old, just having had a birthday. Appellant is the father of three children. Appellant is disabled from an industrial accident, and has some college training. Appellant is part Native American. Appellant explained at some length his version of the events which led to Lieutenant Lutz's death, and urged the jury to realize his version of events fit the evidence better than the State's version.
Appellant also presented the testimony of several of his family members, who testified about appellant's good relationships with his family members and the concern and assistance he had provided to them.
We conclude the State clearly proved beyond a reasonable doubt the aggravated circumstances in this case outweigh the mitigating circumstances. We conclude the death penalty is appropriate punishment in this case.
 PROPORTIONALITY
We next compare this case to others reviewed by this court of appeals in which the death penalty was imposed. This court has previously reviewed seven cases in which the death penalty was imposed. We found the death penalty is appropriate in six cases: State v. Gillard (June 25, 1990), Stark App. No. 6701, unreported (killing two or more persons, aggravated burglary, and aggravated murder); State v. Sneed (May 22, 1989), Stark App. No. 6976, unreported (rape and aggravated murder); Statev. Stumpf (May 22, 1986), Guernsey App. Nos. 760 and 763, unreported (robbery and aggravated murder); State v. Thompson
(June 17, 1985), Licking App. No. 2997, unreported (robbery and aggravated murder); State v. Maurer (February 13, 1984), Stark App. No. 6166, unreported (kidnapping and aggravated murder of a small child); State v. Allard (April 12, 1995), Knox App. No. 93-7, unreported (murder of ex-wife and small daughter and attempted aggravated murder and felonious assault on two sons).
In the seventh case, State v. Glenn (February 19, 1987), Guernsey App. No. 798, unreported, this court vacated a death sentence as inappropriate. Glenn involved two death penalty specifications: Course of conduct involving purposeful killing or attempting to kill two or more persons, and killing of a police officer engaged in his duties. This court found the sentence was inappropriate because of the defendant's diminished capacity. The defendant in Glenn suffered from severe paranoid schizophrenia.
Unlike Glenn, there is no evidence here appellant suffered from a diminished capacity.
Based upon our review of the prior cases in which the death penalty was imposed, we conclude the death penalty imposed in this case, involving the murder of a police officer with his own service weapon, while in the course of investigating a burglary complaint, is not disproportionate or excessive to the other cases we have reviewed.
The judgment of the Court of Common Pleas of Muskingum County, Ohio, is affirmed.
 MANDATE
It is ordered that a special mandate issue out of this court directing the court of common pleas to carry this judgment into execution. A certified copy of this judgment entry shall constitute the mandate pursuant to Ohio App. R. 27.
Certificate to the Supreme Court:
A certified copy of this document shall constitute the separate opinion as to the findings of the court in this case pursuant to R.C. 2929.04 (A). The clerk of this court shall immediately make and file a certified copy of this opinion with the clerk of the Supreme Court of Ohio. See the last paragraph of R.C. 2929.05 (A).
By Gwin, J., Wise, P.J., and Reader, V.J., concur
-------------------------
-------------------------
 ------------------------- JUDGES
 CERTIFY COPY TO SUPREME COURT
A certified copy of this document shall constitute the separate opinion as to the findings of the court in this case within the meaning of R.C. 2929.05 (A) and the clerk of this court shall immediately make and file such certified copy with the clerk of the Supreme Court of Ohio. See the last paragraph of R.C. 2929.05 (A).
-------------------------
-------------------------
 ------------------------- JUDGES
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Muskingum County Common Pleas Court is affirmed.
 MANDATE
It is ordered that a special mandate issue out of this court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this judgment entry shall constitute the mandate pursuant to Ohio App. R. 27.